Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/11/2020 08:07 AM CST

Jeremy D. Westerhold, appellant, v.
Jessica M. Dutton, appellee.

___ N.W.2d ___

Filed February 4, 2020.    No. A-19-166.

1. **Paternity: Appeal and Error.** In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.

3. **Minors: Names: Appeal and Error.** An appellate court reviews a trial court's decision concerning a requested change in the surname of a minor de novo on the record and reaches a conclusion independent of the findings of the trial court.

4. **Child Custody: Visitation.** Nebraska's removal jurisprudence does not apply to a child born out of wedlock where there has been no prior adjudication addressing child custody or parenting time.

5. **Paternity: Child Custody: Time.** The time at which a paternity action is commenced serves as the reference point for determining whether there has been a prior child custody determination under Neb. Rev. Stat. § 43-1227(3) (Reissue 2016).

6. **Paternity: Child Custody: Visitation.** If a paternity action, where there has been no prior adjudication addressing child custody or parenting time, is determined by the children's best interests, then there is no good

reason why *Farnsworh v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), will not be properly included in the analytical framework to determine the children's best interests.

7. **Child Custody.** While an unwed mother is initially entitled to automatic custody of the child, the issue of custody must ultimately be resolved on the basis of the fitness of the parents and the best interests of the child.

8. ____. When both parents are found to be fit, the inquiry for the court is the best interests of the children.

9. ____. The paramount consideration in determining child custody is the best interests of the children.

10. ____. In addition to the "best interests" factors listed in Neb. Rev. Stat. § 43-2923 (Reissue 2016), a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between the child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child.

11. **Child Custody: Visitation.** In determining whether removal to another jurisdiction is in the child's best interests, the trial court considers: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation.

12. **Child Custody: Appeal and Error.** In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

13. **Minors: Names.** The question of whether the name of a minor child should be changed is determined by what is in the best interests of the child.

14. **Minors: Names: Proof.** The party seeking the change in surname has the burden of proving that the change in surname is in the child's best interests.

15. **Minors: Names.** Cases considering the change in surname of a minor child have granted a change only when the substantial welfare of the child requires the surname to be changed.

16. ____: ____. A list of nonexclusive factors to consider in determining whether a change of surname is in the child's best interests include (1) misconduct by one of the child's parents; (2) a parent's failure to support the child; (3) parental failure to maintain contact with the child; (4) the length of time that a surname has been used for or by the child; (5) whether the child's surname is different from the surname of the child's custodial parent; (6) a child's reasonable preference for one of the surnames; (7) the effect of the change of the child's surname on the preservation and development of the child's relationship with each parent; (8) the degree of community respect associated with the child's present surname and the proposed surname; (9) the difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname; and (10) the identification of the child as a part of a family unit.

Appeal from the District Court for Thurston County: John E. Samson, Judge. Affirmed.

Matthew M. Munderloh, of Johnson & Mock, P.C., L.L.O., for appellant.

Douglas J. Stratton, of Stratton, DeLay, Doele, Carlson, Buettner & Stover, P.C., L.L.O., for appellee.

Pirtle, Riedmann, and Welch, Judges.

Pirtle, Judge.

## I. INTRODUCTION

Jeremy D. Westerhold appeals from an order of the district court for Thurston County finding him to be the biological father of Ledger W. Dutton; awarding custody of Ledger to Jessica M. Dutton, Ledger's biological mother; and permitting Jessica to remove Ledger from Nebraska to Illinois. For the reasons that follow, we affirm.

## II. BACKGROUND

Jeremy and Jessica met in August 2016 while they were employed at Ronnefeldt Farms, which is located just outside of Lyons, Nebraska. The two began dating soon after, moved in together, and were briefly engaged to be married. They ended

their relationship in June 2017, while Jessica was pregnant. Jessica gave birth to Ledger in October 2017. On December 20, Jeremy filed a complaint to establish paternity, custody, parenting time, child support, and other related issues. Jeremy sought sole custody of Ledger or, in the alternative, liberal parenting time. Jeremy also sought an order of the court establishing his surname as Ledger's surname. Jessica filed an answer and counterclaim admitting Jeremy is the biological father of Ledger and seeking sole legal and physical custody of Ledger.

On February 21, 2018, Jeremy and Jessica reached an agreement regarding provisions of a temporary order, and the district court approved and ordered the same. The temporary order granted Jeremy parenting time every other weekend and on Wednesday evenings of each week, provided that the parenting time was supervised by Jeremy's parents. On May 9, the court entered a stipulated temporary order that lifted the supervision restriction on Jeremy's parenting time. On July 27, Jessica filed an amended counterclaim requesting that "she be granted the opportunity to move [Ledger] to the Carthage, Illinois area." The matter was tried before the district court on October 22, 2018.

At trial, Jeremy testified that he has resided in Lyons for the last 19 to 20 years. He has spent the last 13 years raising hogs and is currently employed at Ronnefeldt Farms. Jeremy acknowledged that he is the biological father of Ledger.

Jeremy testified that although he signed an acknowledgment of paternity, recognizing that Ledger had been given the "Dutton" surname, he did not agree to the name on the date of trial or at the time he signed the document. He testified that he signed the document merely to acknowledge Ledger as his child and had hoped Ledger would be given the "Westerhold" surname. Jeremy further testified that Jessica previously mentioned a name change prior to Ledger's being born, but that she said she probably would not go through with it, and that he did

not find out until the morning Ledger was born that he would be given Jessica's surname.

Jeremy testified that he first met Jessica in August 2016 after she had obtained employment at Ronnefeldt Farms through her mother, who was a manager there. Soon after, the two began dating, Jessica moved in with Jeremy, and they got engaged. They remained living together until June 2017. After Jessica moved out, she first moved in with her mother, who lived just outside of Lyons, and then to Pender, Nebraska. Jeremy testified that at the time of trial, he believed Jessica was no longer residing in Pender but was staying in Quincy, Illinois. He testified that he recalled the court previously denying Jessica's request to move with Ledger to Illinois at an earlier hearing, but that she moved anyway and left Ledger in Nebraska with a friend of hers, Whitney Larson. Jeremy testified that he barely knew Larson and that he had discussed with Jessica the possibility of Ledger's living with his parents for the time Jessica was living in Illinois before their next court hearing.

Jeremy testified that under a previous temporary order granting him supervised parenting time, his parents, Dan Westerhold and Tami Westerhold, were to supervise. Jeremy testified that Jessica did not want Ledger to stay with Jeremy's parents for the month she was in Illinois and that they had talked about alternating 2 weeks in Lyons and 2 weeks with Jessica in Illinois, but he did not want to go 2 weeks without seeing Ledger.

While Ledger was with Larson, Jeremy maintained the same visitation schedule as before and would provide the transportation to pick Ledger up from daycare and drop him off with Larson. On two occasions, Jessica took Ledger to Illinois for a period of 5 days, but never interfered with the parenting time that had been arranged for Jeremy. Jeremy testified that he never agreed to have Ledger travel to Illinois for that time because he did not believe it was in Ledger's best interests to travel that much.

In October 2018, leading up to trial, Ledger spent 2 weeks with Jeremy's parents at the beginning of the month, and Jessica had him since then. Jeremy was able to maintain his parenting time under the temporary order, and additionally until 8 p.m. every evening.

Jeremy testified that between Ledger's birth in October 2017 and January 2018, he spent approximately 20 hours total with Ledger, despite requesting more time with him. He testified that he had discussed with Jessica having more time with Ledger, but the two never agreed on anything. Jeremy testified that Jessica would never allow him to spend time alone with Ledger and that she would only permit a few hours at a time. In February, Jeremy was granted specific parenting time consisting of Wednesday evenings and every other weekend pursuant to a temporary order. The supervision aspect was lifted in May.

Jeremy testified that Jessica has another child from a previous relationship, Rhett Dutton, who was a few months old when Jeremy first met Jessica. When Jessica moved in with Jeremy, Jessica's brother and Rhett also moved in. Jeremy testified that he would take Rhett to daycare before he went to work each day and would often watch him while Jessica napped. Jeremy would dress Rhett, change his diaper, and provide a bottle for daycare if needed because Jessica had an earlier start to her shift. Jeremy would also feed, bathe, clothe, and change Rhett during the evenings. Occasionally, Jessica would leave Rhett alone in Jeremy's care.

Jeremy testified that the night Jessica moved out, he had left work and began taking care of Rhett. He first took Rhett to Jessica's parents' home, then to his own parents' home where apparently eight people were having a bonfire, and then to his home, where Jeremy put Rhett to sleep. Jeremy then fell asleep, and when he woke up at 11 p.m., Jessica, her brother, and Rhett were gone. Jeremy testified that he had consumed two beers that night. He noted that he did not have

any discussion with Jessica before she left and that they had not discussed her reasons for leaving.

Jeremy further testified that he was aware that Jessica wrote in an affidavit that while the two were living together, he would at times consume alcohol from the time he woke up until he went to bed. He denied ever doing so. Jeremy indicated that he obtained a substance abuse evaluation due to Jessica's concerns about his alcohol use. He testified that he was honest in reciting his history of alcohol use and that no treatment recommendations were provided.

Jeremy testified that he does not drink alcohol presently and has not done so since August 25, 2017. He testified that he chose to stop consuming alcohol for the well-being of Ledger and their relationship. Jeremy admitted that Jessica at times would tell him to stop drinking while they were living together but that she nevertheless permitted him to care for Rhett. Jeremy indicated that his alcohol use has very rarely caused him to be late for work, and not at all within the previous 2 years since Ledger was born. Jeremy testified that he went to South Dakota to "get sober," despite not participating in a formal treatment program, and did come back sober.

Jeremy testified that his parents live in Lyons, his grandmother lives in Pender, and he has other extended family in the Valley-Omaha area in Nebraska. He testified that during their relationship, Jessica would occasionally talk to him about how frequently she moved as a child. He also testified Rhett has lived at four different addresses with Jessica since he was born.

Jeremy testified that he believes awarding him custody of Ledger would be in Ledger's best interests because he provides more structure and stability, he does not plan on moving, and his parents live just "two houses down" from his home. Jeremy further testified that he has had the same employer for the last 13 years, despite brief periods where he did not work. Jeremy testified that although both his parents work full time, they would still have time to watch Ledger when necessary.

Jeremy indicated that he ordinarily goes to work and then goes home, but occasionally will spend time with his friends, who both have children and families of their own. Jeremy testified that he works an average of 114 hours every 2 weeks, but it varies.

Jeremy testified that he does not agree with Jessica's decision to move with Ledger to Illinois because he wants to create a bond with him, watch him grow up, and help him with school and because the distance would not be good for their relationship. He testified that he would like structure for Ledger and that Jessica moves a lot. Jeremy noted that the night before trial, Jessica had mentioned to him that she was going to move to Hebron, Nebraska, if she was not permitted by the court to move to Illinois.

Jeremy testified that if he is awarded custody, he plans on continuing to live in Lyons and work at Ronnefeldt Farms and would not prevent Jessica from seeing Ledger. Jeremy noted that if Jessica remains in Illinois, she would be 6 hours away from Lyons. Prior to trial, he and Jessica had been meeting near the halfway point in Des Moines, Iowa, to arrange visitation with Ledger.

Jeremy went on to testify that he recently received a raise and currently makes $15.50 per hour. Jeremy carries health insurance for Ledger through his employment, and the amount he pays gets automatically taken out of his paycheck. He further testified that he has been paying child support pursuant to the previous temporary order and was voluntarily paying support prior to the order.

Jeremy testified that he is requesting Ledger's surname be changed to Westerhold because Ledger is his "blood" and "Dutton is [Jessica's] adopted last name." He stated, "It's only right that [Ledger] has the Westerhold last name because I'm the last one to carry on the Westerhold name." Jeremy testified that he was upset and left the hospital when he learned that Ledger would be given Jessica's surname. He testified that he and Jessica had previously discussed what

Ledger's surname would be and that he understood it would be Westerhold.

On cross-examination, Jeremy testified that he went to South Dakota in June 2017 to "get sober" in order "to kick the habit completely" because that is what Jessica wanted from him. Jeremy testified that he stayed with a friend, the friend's wife, and their three children and that they watched him in order to make sure he did not "touch" alcohol. He testified that the alcohol evaluation he received does not show the fact that he went to South Dakota to get sober, but that he told the evaluator when she was conducting the evaluation. Jeremy testified that the evaluator informed him that she would talk with collateral sources about his drinking habits, but he was not aware that she spoke with only his mother. Jeremy denied the affidavit of Jessica's brother, saying that on the night Jessica left, Jeremy was intoxicated to the point he passed out.

Jeremy testified that under his current work schedule, he works 14 consecutive days, typically from 6 a.m. until 3 or 4 p.m. He noted that he also receives vacation days and paid time off from his employment. He testified that he has worked for Ronnefeldt Farms for the last 13 years, but briefly quit on two occasions.

Jeremy denied ever threatening Jessica that he could simply take Ledger away, explaining he merely meant that Ledger is his child as well and he should be able to see him when he chooses. He testified that the majority of visits with Ledger originally took place at his home, but that stopped when he made the comment to Jessica about being able to take Ledger.

Justin Redding, Jeremy's friend and his supervisor at Ronnefeldt Farms, testified that he and Jeremy are social outside of work and will occasionally go out for supper or play video games together. Redding testified that he has two children, who were ages 7 and 4 at the time of trial, and that Jeremy is "pretty much family" to them. Jeremy is the godfather of Redding's older child. Redding testified that he and his wife do not drink alcohol and that he does not see

Jeremy drink when they socialize together. Redding testified that in the 12 or 13 years he has worked with Jeremy, he has never seen him drunk at work or known him to be late due to alcohol.

Redding testified that from his observations, Jeremy is "very protective" of Ledger and the two "go hand in hand." Redding testified that he has no reservations having Jeremy take care of his own children and that he has babysat them when they were younger. Redding noted that he has no concerns about Jeremy as a parent.

Tami, Jeremy's mother, testified that she and her husband, Dan, have lived in Lyons together for 18 to 20 years. She testified that they currently live "[t]wo doors over" from Jeremy. Tami testified that her family is from Lyons and that many of them still live around the area, or near Omaha.

Tami testified that when she supervised visitation between Jeremy and Ledger, she did not need to be involved and Jeremy was capable of taking care of Ledger on his own. She testified that overnight weekend visits occurred at Jeremy's home and that she was usually the one to supervise those visits. Tami would observe Jeremy change Ledger's diaper, put his pajamas on, and put him to bed. Jeremy would also care for Ledger when he woke up at night and take care of his morning routine.

Tami testified that on the evening Jessica moved out from Jeremy's home, she received a text from Jessica asking her to get Rhett from Jeremy's home. Afterward, Jessica picked up Rhett from Jeremy's parents' home, she moved out of Jeremy's home, and Tami and Jessica have not spoken much since then.

Tami further testified that she and Dan would have been willing to take care of Ledger for the initial month Jessica was in Illinois, but that did not happen and Ledger was placed in the care of Jessica's friend, Larson. The next month, Ledger spent a couple weeks with Tami and Dan.

Tami testified that she does not believe Jeremy presently consumes or abuses alcohol, but that at one point, he had a problem. On cross-examination, Tami testified that she has not witnessed Jeremy consume alcohol since he went to South Dakota but that others used to say he drank too much.

Dan, Jeremy's father, testified that from his observations while supervising parenting time between Jeremy and Ledger, things went well and Jeremy was "very attentive." He testified that he does not have any concerns about Jeremy's ability to parent Ledger. Dan further testified that when he observed Jeremy take care of Jessica's child, Rhett, he believed that he did a good job doing so.

On cross-examination, Dan testified that he "[p]robably years ago" called Jeremy an alcoholic but that he does not recall doing so in the presence of Jessica. He testified he believes that Jeremy has occasionally made bad decisions in the past and that was the basis for calling Jeremy an alcoholic.

Jessica testified that she moved around quite a bit when she was younger "due to the military," but that she attended school in Hebron from 4th through 12th grades. When her mother remarried in 2007, Jessica was adopted and took her current surname, Dutton. Jessica testified that she moved from Hebron to Grand Island, Nebraska, and later to Trenton, Missouri, for a job opportunity. She moved back to Hebron in January 2016 and then to Pender in August of that year.

Jessica testified that she is the sole provider of Rhett, her child from a previous relationship, and that Rhett's father is not involved in their lives. Jessica testified that before she was engaged to Jeremy, he told her he had another child but that the mother "is bad [sic] shit crazy so [he] want[s] nothing to do with them."

At the time of trial, Jessica was enrolled in college and was pursuing a degree in business administration, with a focus on human resource management, through online courses.

Jessica testified that in February 2017, she found out she was pregnant with Ledger and Jeremy was the first person

she told. Jessica testified that prior to Ledger's birth, she told Jeremy that if he did not seek professional help for his drinking, she would leave him, and that Jeremy responded, "[W]ell, bye."

Jessica further testified that when Jeremy would take Rhett to daycare, she would lay out clothes for Rhett and all Jeremy had to do was change his diaper, dress him, and drop him off at daycare. According to Jessica, Jeremy probably watched Rhett unsupervised only two or three times, in addition to the mornings before taking him to daycare, and never overnight.

Jessica testified that Jeremy went to South Dakota to get sober after she had already left, in July 2017, and that she told him she "didn't think it was a good decision because they were known for their drinking." Jessica testified that she had concerns about the alcohol use of the friends Jeremy stayed with there, because when they had visited "they drank the entire time," and that Jeremy had indicated he used to drink with them when they lived in Nebraska.

Jessica explained that the night she moved out of Jeremy's home, she received a call from her brother and became concerned that her son, Rhett, "was not being safely taken care of." At that point, she called Jeremy's mother, Tami, and asked that she pick up Rhett from Jeremy's home and said she would be at Jeremy's parents' home soon to pick him up. Jessica testified that after she got off work, at around 7:30 p.m., she drove to Jeremy's home. Jessica walked into the living room and found Jeremy sleeping on the couch and a few beer cans on the table. She was able to smell alcohol on his breath. When Jessica shook Jeremy and he did not wake up, she felt that it was not safe to raise her children there so she packed her things, picked up Rhett from Jeremy's parents' home, and stayed with her parents for a few days.

Jessica testified that at one of her medical appointments, prior to Ledger's birth, she told Jeremy that she felt it was best to give Ledger her surname, since it is both her and Rhett's

surname, and that Jeremy got upset but did not want to fight about it.

Jessica testified that Jeremy's father, Dan, on multiple occasions would tell Jeremy that "he was going to lose [Jessica] and the children if he didn't straighten up." She testified that on the night she moved out, when she went to pick up Rhett, Dan called Jeremy a "fucking alcoholic." She testified that while they were together, Jeremy would pick up a case of beer every night after work and drink beer until he fell asleep. During the time Jeremy was not employed, a period of about 2½ months, he would "drink as soon as he would wake up." Jessica testified that her experiences with Jeremy's drinking have shaped how she has dealt with the parenting time he receives with Ledger.

Jessica testified that visitations were initially unstructured until she returned to work, but she brought Ledger to see Jeremy approximately two times a week. Jeremy had originally suggested an arrangement where he spent every other weekend with Ledger, but Jessica was not comfortable with that arrangement without a court order because Jeremy would tell her that he was going to keep Ledger and that he did not have to return him.

Jessica maintained that she has never denied Jeremy is the father of Ledger and that she understands it is important for children to have their father in their life. She testified that she wanted visitation to be supervised because of Jeremy's previous alcohol use and the incident where she discovered him passed out while Rhett was in his care.

Jessica testified that she is employed with Professional Swine Management (PSM) in Carthage, Illinois, and works as the merchandising and logistics coordinator, which corresponds with her education in business administration. She testified that PSM is the company both her parents are employed with and that she received a telephone call about PSM's open positions. She testified that she prefers to stay in the hog

industry and has researched companies near the Nebraska area, but the available positions were not in her field. She noted that her current position with PSM provides a consistent workday of 8 a.m. to 5 p.m., which allows her more time with her children, including holidays, paid time off, and vacation days. Jessica testified that despite accepting the position with PSM in Illinois, she still maintained her residence in Pender in order to not interfere with the court-ordered parenting time.

Jessica testified that she has taken care of Rhett and Ledger every day of their lives and that they love each other and get along "[l]ike brothers." When Ledger leaves for visitation, Rhett will ask where he is. Jessica testified that the two "play all day, all night" and that it's "heartbreaking" when they are apart. She believes this is one reason it is in Ledger's best interests that she be granted full custody.

At the time of trial, Jessica did not have permanent housing in Illinois but noted that she had a place lined up with a landlord who ensured that she and the children had a place to stay in the event she was awarded custody. Jessica testified that she is awarded overtime pay at a rate of $20.25 per hour for anything over 40 hours per week and earns a regular wage of $13.50 per hour. Jessica testified that benefits with PSM include health insurance, a retirement plan, and life insurance. PSM also offers tuition reimbursement for Jessica's last year of college so long as the degree benefits her career with PSM.

Jessica testified that her work schedule at Legacy Garden in Pender, where she worked prior to her move to Illinois, was not structured and that she wanted more structure in order to make it easier to care for Rhett and Ledger. She testified that her daycare in Illinois costs $200 per week for both Rhett and Ledger and that the provider is in the process of getting licensed. She testified that she has looked into the school district in Carthage and believes it will be good for the children.

Jessica's mother and stepfather reside in Moberly, Missouri, which is 1 hour 45 minutes from Carthage. Her brother lives in Quincy. Jessica testified that she is very close to her parents and that she intends to keep them in her life, particularly if she receives full custody of Ledger.

Jessica testified that she does not believe Jeremy has become 100-percent clean from any alcohol abuse without his receiving professional help. She testified that she was never contacted about Jeremy's alcohol use and that she finds it concerning Jeremy's mother was the only collateral source in his evaluation because she would likely say what would benefit Jeremy.

Jessica testified that she believes it is important for her children to be brought up with religion as part of their lives and that it provides them with structure. She testified that Jeremy attended church with her only once or twice and that he said that "he would catch on fire or be struck by lightning if he entered a church."

On cross-examination, Jessica admitted that she has previously been paid a higher hourly rate than her position in Illinois, but that the jobs were different. She testified that her address in Pender is still where her belongings are and that she is listed on the lease, but she is physically living in Illinois with her brother. She agreed that over the last 5 years, she has lived at seven different addresses. Jessica testified that she was living in Grand Island when she was convicted of issuing a bad check because she wrote it out of the wrong account.

Jessica testified that she moved to Illinois for a better job opportunity and to be closer to her immediate family. She does not have a contract for a particular term with PSM and is considered an at-will employee. Jessica indicated that she researched hog companies in Nebraska but there were less opportunities with large companies in the state. She testified that she will generally relocate to a company that is more beneficial for her. She maintained that PSM provides the

opportunity to transfer positions, but she will not need to transfer from PSM because it is so large.

Jessica testified that despite having concerns about Jeremy's drinking, she left Rhett in his care because her brother was there as well, so Jeremy was not alone with Rhett. She further testified that when she went to Illinois, she left Ledger with her friend, Larson, instead of Jeremy's parents, because Larson was someone she trusted and she believed Jeremy's parents would simply do what benefits Jeremy. Jessica testified that she cannot say one way or another whether Jeremy is entirely fit or unfit to be the custodial parent of Ledger due to her concerns with his past alcohol use and her inability to fully trust him. Jessica further testified that she disputes that Jeremy received only around 20 hours of visitation the first 4 months after Ledger was born because she was on maternity leave for the first 6 weeks and would bring Ledger over twice a week, sometimes up to 6 hours at a time.

Pamela Potter testified that she first met Jessica through her daughter, Rebekah Potter, when the two worked together at Legacy Garden, and also through church, but was previously aware of her because Rebekah provided daycare for Rhett. Pamela testified that Jessica would bring Rhett and Ledger with her to church services and that Jessica occasionally brought them to her home. Pamela testified that Jessica is an "excellent mom" and cares for both the physical and mental well-being of her children. She testified that she believes it is in the children's best interests that Jessica receive full custody.

Rebekah, a friend and former coworker of Jessica, testified that she has known Jessica for 3 years, that they met when Jessica's former daycare provider recommended her to provide daycare for Rhett, and that the two later worked together at Legacy Garden. Rebekah provided daycare for both Rhett and Ledger and observed both to be happy children. Rebekah testified that she would spend time with Jessica and the children at least twice a week when Ledger was first born.

Rebekah testified that Jessica is a "great mother" and puts her children before herself. She testified that she believes it would be good for the children if Jessica were granted custody because she has been a good mother and they both love her.

On January 18, 2019, the district court set forth an order awarding Jessica the sole care, custody, and control of Ledger, subject to liberal parenting time with Jeremy. The district court gave consideration to removal factors within its custody and best interests analysis and awarded Jessica custody knowing she would be relocating to Illinois. The district court also found that Jeremy had not met his burden in showing that the requested name change was in the minor child's best interests.

## III. ASSIGNMENTS OF ERROR

Jeremy asserts the district court erred by (1) allowing Jessica to remove their minor child from the State of Nebraska without first requiring her "to strictly prove the factors of removal as provided in *Farnsworth*"; (2) awarding Jessica sole legal and physical custody of their minor child; and (3) ordering that the minor child maintain Jessica's surname.

## IV. STANDARD OF REVIEW

[1] In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012).

[2] A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a

decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Boyer v. Boyer*, 24 Neb. App. 434, 889 N.W.2d 832 (2017).

[3] An appellate court reviews a trial court's decision concerning a requested change in the surname of a minor de novo on the record and reaches a conclusion independent of the findings of the trial court. *State on behalf of Connor H. v. Blake G.*, 289 Neb. 246, 856 N.W.2d 295 (2014).

## V. ANALYSIS

### 1. CUSTODY AND REMOVAL

Jeremy's first assignment of error is that the district court erred when it permitted Jessica to remove Ledger from Nebraska to Illinois. Jeremy argues that the court should have required Jessica to first strictly prove the factors under the *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), removal analysis. Alternatively, Jeremy contends that the district court, to the extent it did apply *Farnsworth*, abused its discretion in concluding the factors weighed in favor of removal. For the reasons that follow, we affirm the district court's order awarding Jessica custody and permitting her to relocate to Illinois with the child.

[4] Jeremy first argues that the district court inappropriately applied our instructive language in *Coleman v. Kahler*, 17 Neb. App. 518, 520, 766 N.W.2d 142, 144-45 (2009), where we held that "Nebraska's removal jurisprudence does not apply to a child born out of wedlock where there has been no prior adjudication addressing child custody or parenting time." Jeremy cites to Neb. Rev. Stat. § 43-1227(3) (Reissue 2016) in his assertion that the *Farnsworth* removal analysis applies here because there has been a prior adjudication in this case. Section 43-1227(3) defines the phrase "child custody determination" as

a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with

respect to a child. The term includes a permanent, temporary, initial, and modification order. The term does not include an order relating to child support or other monetary obligation of an individual.

Jeremy filed his initial complaint seeking a paternity and custody determination on December 20, 2017. On July 27, 2018, Jessica filed a motion to amend her counterclaim for full legal and physical custody, additionally seeking the court's permission to remove the child to Illinois. While there were some issues with the filing of Jessica's amended counterclaim, and Jeremy's reply to Jessica's counterclaim, they agreed to proceed on the issues raised in those pleadings at the commencement of trial on October 22.

Prior to trial, two temporary orders were entered. Jeremy argues that the temporary order entered on February 21, 2018, granting him specific supervised parenting time and that the subsequent stipulated temporary order entered on May 9, removing the supervision component of Jeremy's parenting time, amount to a prior adjudication within the meaning of § 43-1227(3) and *Coleman v. Kahler, supra*. However, we agree with the district court's determination that Nebraska's removal jurisprudence does not apply to this case because, as the court noted in its order, "[a]t the time this action was commenced, no custody order, temporary or otherwise, had been rendered."

[5] In *Coleman v. Kahler*, 17 Neb. App. at 527, 766 N.W.2d at 149, this court cited the definition of the phrase "child custody determination" under § 43-1227(3) in finding that "[u]nder the [statute's] definition, before [the father] commenced the instant proceeding, there had been no child custody determination in this case with regard to either child." Notably, this court referred to the time the paternity action was "commenced" as the reference point for determining whether there had been a prior adjudication. Under § 43-1227(5), the word "commencement" means "*the filing of the first pleading in a proceeding*." (Emphasis supplied.)

In this case, Jeremy filed the initial complaint prior to any temporary order being entered. While *Coleman v. Kahler, supra*, involved a situation where the initial filing and the issue of removal were raised simultaneously, the facts of this case are similar to those in *Derby v. Martinez*, 24 Neb. App. 17, 879 N.W.2d 58 (2016). In *Derby*, an initial complaint to establish paternity was filed, a temporary order regarding parenting time was later entered, and the issue of removal was raised *after* the temporary order. Nevertheless, this court still held that the case involved an initial custody determination and that *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), was to be given some consideration, but was not strictly required. Because we find that there was no prior adjudication addressing child custody or parenting time at the time this case commenced, with Jeremy's complaint, this argument fails.

[6] Jeremy next invites this court to reconsider our application of Nebraska removal jurisprudence to cases such as this, where the underlying action involves a paternity determination in conjunction with questions of custody and removal of a minor child. In doing so, Jeremy cites to our decision in *Rommers v. Rommers*, 22 Neb. App. 606, 858 N.W.2d 607 (2014), where we held that *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009), was distinguishable from the facts before us insomuch as *Coleman* involved a paternity action and *Rommers* involved an action for the dissolution of marriage. In a recent opinion, *Olson v. Olson*, 27 Neb. App. 869, ___ N.W.2d ___ (2019), we reaffirmed our decision in *Rommers* and applied the *Farnsworth* analysis to a custody and removal determination in a dissolution proceeding. Nevertheless, the instant case is a paternity action and within the purview of *Coleman v. Kahler, supra*. We therefore find that Nebraska's removal jurisprudence does not strictly apply. Nevertheless, we acknowledge our previous holding that

> "if the instant case is determined by the children's best
> interests, then we can conceive of no good reason why

*Farnsworth* [*v. Farnsworth, supra*,] would not be prop-
erly included in the analytical framework to determine
the children's best interests." *In re Interest of Eric O. &
Shane O.*, 9 Neb. App. 676, 684, 617 N.W.2d 824, 831
(2000). Accordingly, we give some consideration to the
*Farnsworth* factors in determining custody based on the
children's best interests.

*Coleman v. Kahler*, 17 Neb. App. at 529, 766 N.W.2d at 150.

Based on that background, the district court correctly applied
the relevant factors in granting Jessica custody based on the
minor child's best interests. In conducting its best interests
analysis, the district court considered various factors, includ-
ing, but not limited to, those enumerated in *Farnsworth v.
Farnsworth, supra*. We discuss the best interests factors more
thoroughly below. Nevertheless, we find that the district court
did not abuse its discretion in determining that it was in the
best interests of the minor child to continue to live with Jessica
and permit the child's removal to Illinois.

Jeremy separately assigns that the district court erred in
awarding Jessica the legal and physical custody of Ledger. It
is Jeremy's contention that it is in the best interests of Ledger
that Jeremy be awarded legal and physical custody. We dis-
agree. As previously discussed, Nebraska's removal jurispru-
dence does not apply to a child born out of wedlock where
there has been no prior adjudication addressing child custody
or parenting time. *Coleman v. Kahler, supra*. Therefore, the
issue of removal and custody are determined together based on
the child's best interests.

In a filiation proceeding, questions concerning child custody
determinations are reviewed on appeal de novo on the record
to determine whether there has been an abuse of discretion by
the trial court, whose judgment will be upheld in the absence
of an abuse of discretion. *Derby v. Martinez, supra*.

[7,8] While an unwed mother is initially entitled to auto-
matic custody of the child, the issue of custody must ulti-
mately be resolved on the basis of the fitness of the parents

and the best interests of the child. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). In this case, neither party contests the fitness of the other to parent the minor child. When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Olson v. Olson*, 27 Neb. App. 869, ___ N.W.2d ___ (2019). We therefore direct our attention to the child's best interests.

[9] The paramount consideration in determining child custody is the best interests of the children. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017). Neb. Rev. Stat. § 43-2923 (Reissue 2016) of Nebraska's Parenting Act sets forth a nonexclusive list of factors to be considered in determining the best interests of a child in regard to custody. *Floerchinger v. Floerchinger*, 24 Neb. App. 120, 883 N.W.2d 419 (2016). The factors of § 43-2923 include the relationship of the minor child with each parent; the desires and wishes of the minor child; the general health, welfare, and social behavior of the minor child; credible evidence of abuse inflicted on any family or household member; and credible evidence of child abuse or neglect or domestic intimate partner abuse. See *Floerchinger v. Floerchinger, supra*.

[10] In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

[11] Finally, *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), sets forth three broad considerations in determining whether removal to another jurisdiction is in

the child's best interests. The trial court considers: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation. *Wild v. Wild*, 13 Neb. App. 495, 696 N.W.2d 886 (2005).

Jeremy argues that it is in Ledger's best interests that Jeremy be awarded full custody because he provides a more stable environment than Jessica. However, Jeremy fails to consider the other factors enumerated under § 43-2923 and applicable case law. We find that the district court did not abuse its discretion in considering the appropriate best interests factors, awarding Jessica custody of the minor child, and permitting removal of the child to Illinois.

In its order determining custody and permitting removal, the district court considered each parent's motive for seeking or opposing the move. There is no evidence that Jessica made the decision to move to Illinois to keep the minor child away from Jeremy. Rather, her motivations were employment related. Jessica believed her employer in Illinois could provide the potential for career advancement, a comparable salary to her previous employer, desirable benefits, and stable hours that allow her to spend time with her children. While Jeremy has a legitimate reason to oppose the move due to the distance, the parenting plan and visitation schedule provide him ample opportunity to continue to foster a relationship with Ledger.

The district court also considered various factors in determining the potential that the move holds for enhancing the quality of life for the child and the custodial parent. The district court considered the emotional, physical, and developmental needs of the child. In doing so, the court considered the fact that Jessica has been Ledger's primary caretaker since his birth and "has provided a good home, proper meals,

consistent religious upbringing, and a stable routine for the minor child." At trial, Jeremy conceded that Jessica is a good mother, provides for Ledger's needs, and otherwise keeps a good home. Testimony from Pamela and Rebekah, both of whom had ample opportunity to observe Jessica's parenting with respect to Ledger and her other son, Rhett, supported the fact that Jessica has done well as a mother and provided for her children's needs.

While the record does not suggest that Jeremy is incapable of providing for Ledger, the district court appropriately noted that nearly all of his parenting time has been supervised and that he has had little opportunity to parent on his own without assistance since Ledger's birth. There was also substantial evidence to support that Jeremy has a history of alcohol abuse. While the extent of his alcohol use was disputed, we defer to the district court in its finding that Jeremy's history with alcohol was at least enough to cause concern.

[12] In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). In its order, the district court found Jessica's testimony regarding Jeremy's reoccurring use of alcohol to be credible. The court also found Jessica's recollection of the night in June 2017 where she found Jeremy "passed out" on the couch with several beer cans nearby, while he was supposed to be supervising her minor child, to be credible. Beyond this incident, there was also testimony that Jeremy went to South Dakota to "sober up," that his father had previously called him an "alcoholic," and that Jessica and others repeatedly expressed their concerns over his alcohol use.

Furthermore, while Jeremy argues that he provides a more stable environment than Jessica, insomuch as he has maintained a consistent employer and residence in Lyons for several

years, we disagree. Jeremy testified that he works 14 straight days from 6 a.m. until approximately 3 or 4 p.m., averaging 114 hours every 2 weeks. On the other hand, Jessica testified that her employment opportunity in Illinois provides her more structure and time to spend with her children. Instead of the long hours she worked at Ronnefeldt Farms, her position with PSM in Illinois provides her with a consistent workday of 8 a.m. to 5 p.m., weekends off, and other benefits such as holidays, paid time off, tuition reimbursement, and career advancement. While we acknowledge Jessica has a history of frequently relocating, she testified that her opportunity with PSM would not require her to relocate because it is an expanding company with room for advancement and one central office located in Carthage. Regardless, Jessica has maintained the ability to adequately care for her children despite the frequent moves.

The third consideration under *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), which we give some weight to, is the impact the move will have on contact between the child and the noncustodial parent. In terms of the relationship of the child with each parent, we find that both parents have a close and loving relationship with Ledger. While the move certainly will impact Jeremy's ability to visit Ledger, the parenting plan provides for a reasonable visitation schedule that allows for him to continue to foster a relationship with Ledger. Furthermore, the plan acknowledges that Jessica made the decision to move and allocates her 60 percent of the traveltime and expense.

Both parents are close with their extended families and have a desire to maintain those relationships in Ledger's life going forward. While we acknowledge that awarding custody to Jessica would strengthen Ledger's relationship with his maternal relatives, at the expense of closer contact with his paternal relatives in Nebraska, the district court's parenting plan provides ample opportunity for both families to be involved in his life going forward. We also find it important

to address Ledger's relationship with his half brother, Rhett, who is Jessica's child from a previous relationship. Jessica testified that Rhett and Ledger love each other, get along, and play together and that every time Ledger leaves for visitation, Rhett asks where he is. We do not take lightly the effect disrupting this sibling relationship would have on both of the minor children.

Overall, we find that the district court did not abuse its discretion in determining that awarding Jessica custody, and permitting removal, was in the best interests of the minor child. The district court conducted a thorough analysis of the best interests factors in its order, and we do not disturb its findings on this appeal.

## 2. Surname of Minor Child

[13-15] Jeremy's final assignment of error is the district court erred when it ordered that Ledger shall maintain the surname of Dutton. We disagree. The question of whether the name of a minor child should be changed is determined by what is in the best interests of the child. *State on behalf of Connor H. v. Blake G.*, 289 Neb. 246, 856 N.W.2d 295 (2014). The party seeking the change in surname has the burden of proving that the change in surname is in the child's best interests. *Id*. Cases considering this question have granted a change only when the substantial welfare of the child requires the surname to be changed. See *id*.

[16] The Supreme Court has set forth a list of nonexclusive factors to consider in determining whether a change of surname is in the child's best interests. See, *In re Change of Name of Slingsby*, 276 Neb. 114, 752 N.W.2d 564 (2008); *In re Change of Name of Andrews*, 235 Neb. 170, 454 N.W.2d 488 (1990). These factors are (1) misconduct by one of the child's parents; (2) a parent's failure to support the child; (3) parental failure to maintain contact with the child; (4) the length of time that a surname has been used for or by the child; (5) whether the child's surname is different from the surname of

the child's custodial parent; (6) a child's reasonable preference for one of the surnames; (7) the effect of the change of the child's surname on the preservation and development of the child's relationship with each parent; (8) the degree of community respect associated with the child's present surname and the proposed surname; (9) the difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname; and (10) the identification of the child as a part of a family unit. *Id*.

Applying these factors, we find that Jeremy has not met his burden of showing that changing Ledger's surname to Westerhold is in his best interests. Nevertheless, we discuss each of these factors in turn on our de novo review of a requested change in the surname of a minor.

### (a) Parental Misconduct

The district court correctly found that there was no evidence of misconduct by either parent. While the court acknowledged Jeremy's argument that Jessica "changed her mind at the hospital," which he maintains on appeal, it correctly noted that Jeremy nevertheless decided to sign the acknowledgment of paternity with the Dutton surname. Jeremy also argues that Jessica engaged in misconduct by withholding parenting time from him, but we agree with the district court that her concerns surrounding Jeremy's alcohol use, especially finding him passed out while her other minor child was in his care, were justified. This factor is neutral.

### (b) Parental Failure to
### Support Child

The district court correctly found that both parents have properly supported the child. This factor is neutral.

### (c) Parental Failure to Maintain
### Contact With Child

The district court correctly found that both parents have maintained contact with the minor child. This factor is neutral.

### (d) Length of Time Surname
### Has Been Used

The minor child was born in October 2017 and has maintained the Dutton surname for the duration of those 2 years. Nevertheless, due to the young age of the child, this factor is a nonissue.

### (e) Whether Child's Surname Is Different
### From Surname of Custodial Parent

The district court granted, and we affirm, the sole care, custody, and control of the minor child with Jessica. This factor weighs in favor of maintaining the Dutton surname.

### (f) Child's Reasonable Preference

The minor child is now 2 years old and unable to express a reasonable preference for either surname. This is a nonfactor.

### (g) Effect on Preservation and Development
### of Child's Relationship With Each Parent

Jeremy testified that he is requesting Ledger bear the Westerhold surname, because "He's my blood. I mean, granted, Dutton is her last name, but it is her adopted last name." He also testified, "It's only right that [Ledger] has the Westerhold last name because I'm the last one to carry on the Westerhold name." We find no merit in these arguments.

It is true that Ledger is Jeremy's "blood," but the same is true of Jessica. It is irrelevant whether the Dutton surname is Jessica's birth surname or adopted surname. Jessica testified that she was adopted in 2007 and has carried the Dutton surname since. In an era where the trivial distinction between biological and adopted children means very little, including in the eyes of the law, there is no reason why this should sway our analysis. We find that Jeremy has been given ample opportunity to interact with Ledger through the parenting time awarded in the district court's parenting plan and that Ledger's maintaining the Dutton surname will do little to

hinder Jeremy's ability to preserve and develop a relationship with Ledger. This factor weighs against the requested name change.

### (h) Degree of Community Respect Associated With Child's Present Surname and Proposed Surname

There was no evidence introduced to suggest that either the Westerhold surname or the Dutton surname carry anything but respect within the community. This factor is neutral.

### (i) Difficulties, Harassment, or Embarrassment That Child May Experience From Bearing Either Surname

There is no evidence that bearing either the Westerhold surname or the Dutton surname would cause the minor child any difficulty, harassment, or embarrassment. This factor is a nonissue.

### (j) Identification of Child as Part of Family Unit

As previously mentioned, custody of the minor child was awarded to Jessica, and we affirm this decision. Furthermore, Jessica has custody of another minor child from a previous relationship who bears the Dutton surname. There is a strong interest in having the family unit of Jessica, Ledger, and Ledger's half brother maintain the same surname. This factor weighs against the proposed name change.

### (k) Conclusion

Based on the factors set forth in the Supreme Court's decisions of *In re Change of Name of Slingsby*, 276 Neb. 114, 752 N.W.2d 564 (2008), and *In re Change of Name of Andrews*, 235 Neb. 170, 454 N.W.2d 488 (1990), we find that Jeremy has not met his burden of showing that changing Ledger's surname to Westerhold is in his best interests. The minor child shall maintain the Dutton surname.

## VI. CONCLUSION

We conclude that the district court did not err in awarding sole legal and physical custody of Ledger to Jessica and permitting Jessica to move with Ledger to the State of Illinois. We further find that it was not error for the district court to conclude it was in the child's best interests to maintain Jessica's surname.

AFFIRMED.