IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE ON BEHALF OF VANESSA D. & NOAH D. V. KRISTOPHER D.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA ON BEHALF OF VANESSA D. & NOAH D.,
MINOR CHILDREN, APPELLEE,

V.

KRISTOPHER D., APPELLANT.

KRISTOPHER D., APPELLANT,

V.

KAYLA B., APPELLEE.

Filed February 22, 2022.    Nos. A-21-635, A-21-636.

Appeals from the District Court for Boone County: RACHEL A. DAUGHERTY, Judge. Affirmed.

Mitchell C. Stehlik, of Stehlik Law Firm, P.C., L.L.O., for appellant

Justin D. Bignell, of Nebraska Department of Health and Human Services, for appellee State of Nebraska.

Brandi J. Yosten, of Yosten Law, L.L.C., for appellee Kayla B.

MOORE, ARTERBURN and WELCH, Judges.

WELCH, Judge.

INTRODUCTION

Kristopher D. appeals from the district court's order granting Kayla B. primary physical custody of the parties' three minor children, considering his earning capacity in determining his

child support obligation, and in failing to divide the dependency tax exemptions between the parties. For the reasons herein, we affirm.

## STATEMENT OF FACTS

Kristopher and Kayla are the parents of three minor children: Vanessa D., 13 years old; Noah D., 12 years old; and Kallum D., 9 years old. Kristopher and Kayla began dating in 2000 when Kayla was 15 years old and Kristopher was 19 years old. They remained together until 2018 with the exception of a short period of time when they split but later reconciled. The parties separated permanently in June 2018 following a physical altercation between Kristopher and Kayla's father which occurred in front of the parties' children. Since the parties' separation, the minor children have resided with Kayla.

In 2009, the district court entered an order establishing Kristopher's paternity of Vanessa and Noah and setting Kristopher's child support at $381 per month for the two children. The order did not address custody or parenting time.

In July 2020, the State filed a complaint seeking to modify the previously entered child support order to include Kallum, who Kristopher had recognized as his child by signing a notarized paternity acknowledgement in 2012. Kristopher filed a response seeking a credit for child support arrears which accumulated during the time that Kristopher and Kayla lived together because his "income was used to provide for the care and well-being of the entire family, including the three minor children."

In a separate case, Kristopher filed a complaint requesting a determination of paternity, custody, parenting time, and child support. Kayla filed an answer and cross-complaint seeking, inter alia, a determination of paternity as to Kallum, temporary and permanent custody of the three minor children, and child support. In his answer to Kayla's cross-claim, Kristopher requested either sole custody or joint legal and physical custody of the parties' children and the establishment of child support. These two cases were consolidated before the trial court and this court.

At the start of the trial, the State offered multiple exhibits including the signed paternity acknowledgement for Kallum, both parties' employment verification letters which were used to prepare the State's proposed child support calculations, the State's proposed child support calculation using the parties' actual reported earnings, and the State's proposed child support calculation imputing each parent with a 40-hour workweek. Each of these exhibits were received for demonstrative purposes. In addition to the State's evidence, other evidence established that at the time of the trial, Kayla was employed as a patient care coordinator at a local health center typically working 4 days per week from 8 a.m. to 5 p.m. earning $13.50 per hour. Kayla provided the court with her 2020 tax return and a proposed child support calculation which was received for demonstrative purposes. Kristopher was currently employed in the concrete and carpentry industry earning $20 per hour working approximately 20 hours per week except in the summer when Kristopher testified that he receives a lot more hours working 12-hour days. Kristopher provided the court with his W2 forms from 2017, 2018, and 2019. Kristopher testified that he would like the court to enter an order dividing the tax dependency exemptions for the minor children on an equal basis. Kayla testified that she did not object to dividing the tax exemptions with Kristopher provided he was current with his child support obligation on December 31 of the applicable year.

The evidence adduced at trial established that prior to their 2018 separation, Kristopher and Kayla resided together with their children primarily in Nebraska. Since 2000, the parties lived together except for about 3 months, when they lived apart but "were still dating." According to Kristopher, he was the primary provider of financial support for the family and both parties provided daily care for the children.

After the parties' separated in 2018, the children resided with Kayla, who was their primary caretaker. Kristopher exercised visitation with the children every other weekend from 6 p.m. on Friday to 6 p.m. on Sunday despite the absence of a formal visitation plan. Although Kristopher testified that he had perhaps missed 1 or 2 days of parenting time, he had not cancelled visitation with the children. He further testified that he and the children call and text "all the time" and he pays their cell phone bills. During one part of his testimony, Kristopher admitted that he did not ask for additional time with the children, but elsewhere in his testimony he stated that he requested additional parenting time on a "number" of occasions but could not identify the last time that he did so.

At the time of the trial, the parties resided four blocks away from each other in Albion and both had family living in the area who regularly interacted with the children. Kristopher lived next door to his parents, and Kayla's parents, grandparents, and sister lived nearby.

Kristopher testified that he had a good relationship with his children, spending a great deal of time outside in the summer going to a nature preserve, going to the shooting range, or walking by the river. Kristopher stated that he generally had the children pack what they needed from Kayla's home because he could not afford to purchase additional items for the children due to his child support obligation. Kristopher stated that he did not have concerns regarding Kayla's parenting but believed that the parenting schedule should be alternating weeks due to the parties' close proximity.

Although Kristopher generally did not have concerns regarding Kayla's parenting, Kayla expressed concerns with Kristopher's violent behavior which occurred in front of the children. Kayla indicated that Kristopher assaulted her father in front of the children and that Kristopher had previous assault charges. Kristopher acknowledged that there had been times where he had become aggressive or intentionally damaged property in the children's presence, admitted to the 2018 physical altercation with Kayla's father, and admitted that he had punched the windshield of Kayla's car.

Kayla also expressed concern about Kristopher's substance use and the friends that he allowed to visit when the children were present. She stated that, before the parties' separation, Kristopher admitted to her that he had used methamphetamine and that "he smokes pot regularly." Kristopher stated that he and Kayla used methamphetamine in high school, but that he had not used it since that time and that he does not smoke marijuana when the children are in his care. Kayla further stated that the children have told her that Kristopher was drinking and driving while the children were in the car and had failed to buckle the children in seatbelts or car seats. She stated that although she reported these issues to law enforcement, no action was taken. Kayla further admitted that when she was 18 years old, she was convicted of attempted possession of oxycodone, attempted possession of Adderall, and attempted theft of both substances, which offenses had occurred when she was 16.

The parties generally agreed that their communication was poor which detrimentally affected their ability to co-parent. Kristopher stated that although Kayla used to provide him with details about the children's activities, events, and appointments, she had ceased doing so. However, he admitted that he had not contacted the children's school to obtain the children's schedules or to be placed on the school mailing list; that he had not attended any parent-teacher conferences for the last 3 years; and that he did not check the children's report cards, progress reports, or contact the children's teachers. Kristopher acknowledged that the children were enrolled in activities and stated that he had only missed a few of those competitions. Kayla testified that Kristopher did not attend the children's medical appointments. Kristopher testified that he did not know the names of the children's medical care providers, dentists, or therapists and was unaware when their last appointments took place.

In contrast, Kayla ensured that the children's medical and educational needs were met. According to Kayla, she enrolled the children in school and all three children did well academically, but Kallum has struggled with reading and has an Individualized Education Program (IEP) to assist him in that area. Kayla stated that she attended parent-teacher conferences, IEP meetings for Kallum, and the children's activities. She also scheduled and attended all the children's medical appointments. She described her relationship with her children as "great" and stated that in addition to day-to-day activities, they play on their trampoline, go for bicycle rides, and watch movies.

Kayla stated she stopped providing Kristopher with information regarding the children because he had access to the children's school calendar and because he did not attend the children's activities, events, and appointments even after being informed about them. Although Kayla admitted that the children love being around Kristopher, he is inconsistent with the responsibilities of parenting, such as helping with homework or discipline, and he tends to just do fun activities with the children.

Kristopher adduced evidence from his parents, a neighbor, and two of his friends regarding his relationship with his children. Kristopher's parents testified that they see the children on weekends during Kristopher's parenting time and both of his parents testified that Kristopher has a good, loving, and fun relationship with his children. Kristopher's father admitted that Kayla is a "good mom," but testified that he believed that it was in the minor children's best interests for Kristopher and Kayla to have an equal amount of parenting time. Kristopher's mother testified that she believed the children would benefit from more parenting time with Kristopher because they expressed that they want to see him more. Jana Rasmussen, Kristopher's neighbor, testified that both Kristopher and Kayla are "good parents" and that the children "seem really happy" with Kristopher. Tonja Garinger, Kristopher's friend, testified that Kristopher and the children were engaged in activities and that Kristopher was a "great father." Another of Kristopher's friends, Martha Anderson, testified that Kristopher and the children have a loving relationship.

However, Kayla's father stated that Kristopher's parenting skills were lacking as he allowed the children to do "whatever," whereas Kayla is an "exceptional" parent who was always aware of where the children were and what they were doing. He also said that Kayla's greatest strength as a parent was "[s]acrifice. What she's willing to do to make sure that her kids come first before her." Kayla's mother testified that Kayla's greatest strength as a parent is "[h]er dedication

and support," and Kayla's brother testified that she was "a strong mother" who was always trying to do what was best for the children.

Vanessa, the parties' 13-year-old child, testified that she and her brothers see Kristopher every other weekend and sometimes on days when they do not have school. She enjoys spending time with Kristopher and stated that they do things like go to the lake and have family movie and game nights. Vanessa indicated that she gets along pretty well with Kristopher although she feels Kristopher has closer relationships with Noah and Kallum since they relate to each other more. Vanessa also agreed that she spoke to Kristopher on the phone, that she texted him good morning and goodnight daily, and that sometimes they called each other just to talk.

Vanessa explained that Kristopher leaves for work early in the mornings, requiring her to get her brothers ready for school which she found stressful. Vanessa also stated that she felt worried at Kristopher's house because, if Kristopher and Vanessa's grandmother argued, they would remain mad at each other all weekend and it ruined the weekend. Vanessa expressed concerns about fighting with Kristopher and just wanting to be with Kayla when she was going through something; being stressed when Kristopher took them to school late; her fear of upsetting Kristopher because she preferred to take the bus; and her feeling of being left out or making her dad mad at her. Vanessa stated that Kayla always tried her best to attend Vanessa's activities, but that Kristopher only attended about half her activities and did not try as hard as he could to come and watch her. Vanessa was participating in therapy at the time of trial to help her manage her anxiety. Although Vanessa asked Kristopher to attend therapy with her, Kristopher had not participated.

Vanessa also testified that her dad drinks "a lot but it doesn't affect him very much. But I'm sometimes scared he's going to drink too much and his body isn't going to be used to it and . . . he could get alcohol poisoning or something like that." She also testified about feeling uncomfortable about Kristopher's friends coming over and getting drunk; however, she acknowledged that Kristopher asks his friends to leave when Vanessa tells him she is uncomfortable. Vanessa stated that she was aware that Kristopher used to smoke marijuana and, although he did not do so in her presence, she could tell when he had smoked it because "his eyes get really red" and she could smell it.

Vanessa testified that she has a close relationship with Kayla and that she wanted to live with Kayla during the week but maintain visitation with Kristopher every other weekend. Vanessa stated that her brothers want to do an alternating week schedule, but she feels it is because they do not understand the other details of the arrangement.

In June 2021, the court entered a decree awarding the parties joint legal custody with Kayla being granted final decision-making authority if the parties could not agree and awarding primary physical custody to Kayla. The court noted that both parties had a good relationship with their children, but that, following the parties' separation, Kayla had provided more of the children's day-to-day care. The court found the children were in good health and actively participated in school and activities. However, the court expressed some concern with Kristopher's parenting, stating:

> Of concern to the Court was the evidence presented about [Kristopher's] drinking and drug use, his physical fight with [Kayla's] father in front of the children, his admission

to punching out a windshield and his lack of involvement in the children's school. [Kristopher] testified that he had made efforts to reduce his drinking since the parties separated, which the Court applauds. It is apparent that his substance use also concerns his children.

The Court is also concerned about the parties' inability to communicate about the children. The natural consequence is that [Kristopher] communicates with Vanessa causing her extra anxiety and responsibility too great for a child of her age. The parents are encouraged to communicate with one another either by text, phone or by a parenting application on their electronic devices.

The evidence before the Court is that during the parties' relationship there have been two separations; one lasting for a couple of months and the other for approximately three years. During each separation, the children have been in the custody of [Kayla]. While the parties could improve their communication, [Kayla] has provided for the children in an appropriate way during these periods. While [Kristopher] has maintained contact with the children and has a good relationship with them, he has been less than consistent in his parenting.

The court ordered Kristopher to pay child support of $623 for the parties' three children. In making this determination, the court used Kristopher's earning capacity, which the court placed at $2,100 per month based upon its finding that although Kristopher currently averaged working 20 hours per week at $20 per hour, Kristopher had earned more in the past and had the capacity to work an additional 10 hours per week earning minimum wage. The court used Kayla's earnings at $1,862 per month using her actual rate of $13.42 per hour for 32 hours. While there was no mention of the child dependency tax exemptions within the decree, the attached child support worksheets designated that Kayla would receive the exemptions for all three minor children. In a separate order entered on July 15, 2021, the court provided Kristopher with a $15,915.42 child support credit for arrears that accumulated while the parties were residing together. Kristopher has timely appealed to this court.

## ASSIGNMENTS OF ERROR

Kristopher assigns that the district court abused its discretion in (1) awarding Kayla primary physical custody of the minor children instead of awarding the parties' joint physical custody, (2) imputing Kristopher's monthly earning capacity at $2,100 for the purpose of calculating his child support obligation, and (3) failing to equitably divide the child dependency tax exemptions for the minor children.

## STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Westerhold v. Dutton*, 28 Neb. App. 17, 938 N.W.2d 876 (2020); *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). An award of a dependency exemption is reviewed de novo to determine whether the

- 6 -

trial court abused its discretion. *Prochaska v. Prochaska*, 6 Neb. App. 302, 573 N.W.2d 777 (1998).

An appellate court reviews proceedings for modification of child support de novo on the record and will affirm the judgment of the trial court absent an abuse of discretion. *Schwarz v. Schwarz*, 289 Neb. 960, 857 N.W.2d 802 (2015). In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Westerhold v. Dutton, supra*; *Citta v. Facka, supra*.

A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Westerhold v. Dutton, supra*; *Boyer v. Boyer*, 24 Neb. App. 434, 889 N.W.2d 832 (2017).

## ANALYSIS

### CUSTODY DETERMINATION

Kristopher first asserts that the district court erred in awarding Kayla primary physical custody of the parties' children instead of awarding the parties joint physical custody. He contends that "the evidence presented at the time of trial demonstrated that joint physical custody was in the best interests of the minor children." Brief for appellant at 14.

Neb. Rev. Stat. § 43-2923 (Reissue 2016) provides:

(6) In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

See *Wolter v. Fortuna*, 27 Neb. App. 166, 928 N.W.2d 416 (2019).

In addition to the statutory factors relating to the best interests of the child, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude

and stability of each parent's character; parental capacity to provide physical care and satisfy educational needs of the child; the child's preferential desire regarding custody if the child is of sufficient age of comprehension, regardless of chronological age, and when such child's preference is based on sound reasons; and the general health, welfare, and social behavior of the child. *State on behalf of Dawn M. v. Jerrod M.*, 22 Neb. App. 835, 861 N.W.2d 755 (2015); *Collins v. Collins,* 21 Neb. App. 161, 837 N.W.2d 573 (2013).

Here, the district court noted that although the children had a good relationship with both parents, Kayla had provided more of the day-to-day parenting for the children including attending events, making appointments, and communicating with the children's school. The court acknowledged that all three children were "bright young people" who were involved with school and participated in age-appropriate activities and that Vanessa's opinions given during her testimony were "based upon sound reasoning." The court expressed concern with Kristopher's drinking and drug use, his physical altercation with Kayla's father which occurred in the children's presence, Kristopher's admission to punching out a windshield, and his lack of involvement in the children's school. The court also expressed concern about the parties' poor communication which it found causes Vanessa "extra anxiety and responsibility too great for a child of her age." Based upon these factors and Kristopher's inconsistent parenting, the court determined that the minor children's best interests were served by awarding physical custody to Kayla. After conducting a de novo review of the record, we agree.

The record establishes that Kayla has been the primary caregiver for the children meeting their educational, medical, and emotional needs. Kristopher did not stay apprised of information governing these basic needs, nor did he request the information to ensure these basic needs of his children were being met. Specifically, Kristopher did not know who provided medical or dental treatment for the children, nor did he attend appointments. He did not request the children's report cards, nor did he attend parent-teacher conferences. Although he attended some of the children's activities and actively engaged with the children during his visitation, his parenting was inconsistent. We agree with the district court's determination that although the record shows that the children have good relationships with both parents, Kayla provides for the children's health, safety, and welfare.

Notably, Vanessa, the parties' minor child, indicated her desire to reside with her mother and expressed concerns about Kristopher's drug use and her discomfort around Kristopher's friends. There was substantial evidence raising issues of concern about Kristopher's aggressive and violent behavior at times, and concerns about Kristopher's excessive use of alcohol and drugs while in the presence of his children. We give weight to the fact that the district court heard and observed the witnesses in this case and found that Kayla's and Vanessa's testimony was more credible. We find that the district court did not abuse its discretion in awarding Kayla primary physical custody of the parties' minor children. This assignment of error fails.

EARNING CAPACITY

Kristopher next contends that the district court erred in using his earning capacity, rather than his actual earnings, in calculating his child support obligation.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). Under Neb. Ct. R. § 4-204(E) (rev. 2020):

> If applicable, earning capacity may be considered in lieu of a parent's actual, present income. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources. When imputing income to a parent, the court shall take into consideration the specific circumstances of the parents, to the extent known. Those factors may include the parent's residence, employment and earnings history, job skills, educational attainment, literacy, age, health, and employment barriers, including criminal record, record of seeking work, prevailing local earning levels, and availability of employment.

The use of earning capacity in calculating child support is useful when it appears that the parent is capable of earning more income than is presently being earned. *Roberts v. Roberts*, 25 Neb. App. 192, 903 N.W.2d 267 (2017). Earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). And, in child support cases, the court must determine the parent's current monthly income from the most reliable evidence presented. *Collins v. Collins*, 19 Neb. App. 529, 808 N.W.2d 905 (2012).

Here, the district court found that Kristopher's earning capacity was $2,100 per month. The court specifically found that at the time of trial, Kristopher was working an average of 20 hours per week at the rate of $20 per hour. However, the district court further found Kristopher was capable of working an additional 10 hours per week earning minimum wage. In furtherance of that finding, the court indicated that in the past, Kristopher had earned more by working two part-time jobs and by working more hours; that, in 2017, Kristopher had earned $24,132; and that Kristopher only provided pay stubs for the winter months (upon which his current average income was calculated) but testified that he works more hours in the summer months.

Based upon our de novo review of the record, we find that the district court's use of Kristopher's earning capacity to calculate his child support obligation was not abuse of discretion. Based upon Kristopher's work history, his testimony that he works more than 20 hours per week in the summer months, and his overall physical ability to work as evidenced by his current and prior employment, the record indicates that through reasonable efforts, Kristopher is both capable of, and had previously realized, the earning capacity determined by the district court. This assignment of error fails.

CHILD DEPENDENCY TAX EXEMPTIONS

Kristopher's last argument is that the district court erred when it failed to issue an order dividing the child dependency tax exemptions equally between Kristopher and Kayla.

A tax dependency exemption is an economic benefit nearly identical to an award of child support or alimony. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In general, the custodial parent is presumptively entitled to the federal tax exemption for a dependent child. *Id.* But a court may exercise its equitable powers and order the custodial parent to execute a waiver

of his or her right to claim the tax exemption for a dependent child if the situation of the parties so requires. *Id.*

Here, although the court's order did not specifically allocate the tax dependency exemptions, we note that the attached child support worksheets allocated all three of the child dependency exemptions to Kayla. As custodial parent, Kayla is presumptively entitled to the exemptions, and we find no circumstances in this case which would warrant a departure from the presumptive rule by which dependency exemptions are allocated to the custodial parent. We therefore conclude that the district court did not abuse its discretion in allocating the exemptions to Kayla.

## CONCLUSION

For the reasons stated above, we affirm the district court's order in its entirety.

AFFIRMED.