IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

EMONS V. EMONS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MEGAN N. EMONS, APPELLEE,

V.

NATHANIEL J. EMONS, APPELLANT.

Filed May 20, 2025.    No. A-24-632.

Appeal from the District Court for Seward County: JAMES C. STECKER, Judge. Affirmed.

Dana M. London for appellant.

Sean M. Reagan, of Reagan Law Offices, P.C., L.L.O., for appellee.

PIRTLE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

Nathaniel J. Emons appeals from the Seward County District Court's order modifying custody to award Megan N. Emons sole legal and physical custody of the parties' three children. He argues that the district court abused its discretion in modifying custody and in calculating child support. For the reasons stated herein, we affirm.

## STATEMENT OF FACTS

In December 2021, the district court entered a decree of dissolution which awarded the parties joint legal and physical custody of their three children: Wyatt John Emons, born in June 2011; Hunter James Emons, born in March 2013; and Owen Jackson Emons, born in December 2015. At the time of the initial decree, neither party was ordered to pay child support. Since the time of the initial decree through the date of trial, the parties shared physical custody of the three children on a week on/week off basis.

In January 2023, Megan filed a complaint for modification alleging that a material change of circumstances had occurred since the entry of the initial decree in that "certain mental health issues have affected one of the parties hereto which both directly and indirectly impact the children and their safety and well-being." Megan requested that the parties' parenting plan be modified "to include certain safety plans and provisions to include, but not necessarily be limited to, requirements for counseling and therapy, as well as any other terms and conditions deemed appropriate by the Court." Nathaniel filed a general denial to Megan's complaint for modification and requested that the court dismiss Megan's complaint.

The trial in this matter was held in July 2024. Testimony was adduced from the parties; Andrea Ruiz, a mental health therapist for one of the children; Seward County Deputy Sheriff Curtis Anderson; Seward County Sheriff's Sergeant Troy Schaeffer; Seward County Sheriff's Training Sergeant Cord Becker; Melissa McMahon, an acquaintance of the parties; Daniel Conners, Nathaniel's sister; and Cassandra Payne, Nathaniel's girlfriend.

## NATHANIEL'S TESTIMONY

Nathaniel testified that since the entry of the decree, the parties have shared joint physical custody of their three children. Nathaniel acknowledged that in 2022 and 2023 he suffered from some mental health concerns but stated that he had addressed the concerns on his own; that he had a stable support system; that he left a toxic relationship; that he stopped drinking around the children; and that he had maintained his employment. Nathaniel testified that he earned approximately $44 per hour and that he was also in the Army National Guard. Nathaniel testified that he is more self-aware of his mental health and that he utilizes his support system at work and his family. Nathaniel testified that he has an "extremely close relationship" with his children and that he is actively involved in their education and activities.

Nathaniel testified that from the time of the divorce until late 2022, he was in a "toxic" or "difficult" relationship with Caitlin S., who lived a block away from him. He testified that during times that their children played together, he and Caitlin would drink alcohol. Nathaniel admitted that there were incidents of domestic violence during his relationship with Caitlin and that between them they had filed requests for three protection orders. The first protection order was filed by Caitlin against Nathaniel and issued by the court but was subsequently dismissed by her. Caitlin then filed another request for a protection order that was issued and remained active at the time of trial. Nathaniel sought a protection order following the issuance of Caitlin's second protection order, but the court denied Nathaniel's request. Nathaniel testified that his last contact with Caitlin was in January 2023.

Nathaniel testified that after his relationship with Caitlin ended, he began a new relationship in February 2023 with Cassandra Payne and that they moved in together in July. Nathaniel testified that around May 3, he and Payne were interviewed by law enforcement regarding allegations of Payne physically neglecting Nathaniel's children. Nathaniel admitted that once Payne took some of the children to Iowa but that he had informed Megan by text.

Nathaniel acknowledged that in 2022 and 2023 he had at least six contacts with law enforcement, but the children were not present during any of the contacts. Additionally, law enforcement removed Nathaniel's firearms three times between 2022 and 2023.

Nathaniel testified that he sought help to manage his mental health concerns and alcohol use. Nathaniel testified that between July and November 2022, he had approximately 12 counseling sessions with Jenina Lepard. Nathaniel testified that in November 2022, he also saw a doctor to obtain a 90-day prescription for Naltrexone to help him stop drinking alcohol. Nathaniel took the medication as prescribed but continued to consume alcohol, causing him to become sick. Nathaniel testified that he continued to drink alcohol up to the date of trial but that "it's just reduced significantly." Nathaniel also testified that he voluntarily underwent a substance use and mental health evaluation in November 2023, but that neither evaluation made any recommendations for treatment. Nathaniel stated that he self-reported his drinking and suicidal ideations to the evaluators, but no collateral information was provided during the evaluations. Nathaniel testified that he would be willing to redo the evaluations if necessary so the evaluator could consider police reports, case depositions, and other collateral information. Nathaniel also indicated that he would be willing to participate in counseling with the parties' children.

## MEGAN'S TESTIMONY

Megan testified that she was employed earning $33.59 per hour and that she also volunteered for the fire department and rescue squad. Megan testified that the boys generally did well in school and were involved in extracurricular activities including athletics and music. She stated that both she and Nathaniel attended the children's activities, parent-teacher conferences, and helped the boys with homework.

However, Megan testified that in 2023, she learned about "the rash of suicide threats" by Nathaniel, his contacts with law enforcement, and concerns of domestic violence between Nathaniel and Caitlin. Megan testified that these concerns ultimately led her to file the complaint to modify and seek sole legal and physical custody of the parties' children. Megan testified that although Nathaniel testified to having addressed his mental health concerns, she believed that Nathaniel "cherry picked the facts" he provided to the evaluators because no collateral information was provided and neither evaluation discussed Nathaniel's numerous suicidal threats, the extent of his law enforcement contacts, or information pertaining to the protection orders filed involving Nathaniel and Caitlin.

Megan testified that although she did not initially identify that Nathaniel was suffering with mental health concerns, some of the conversations between her and Nathaniel began to cause her concern about the children's safety in Nathaniel's home. She testified that between October 5 and 11, 2022, she and Nathaniel had a conversation wherein Nathaniel indicated that Owen might have a bruise on his face. Megan further testified that on November 27, Nathaniel messaged her that he was "having a rough time" and wanted to return the boys to her. After Nathaniel met Megan in person, Megan testified that Nathaniel asked her to take the boys so he could "get out of here" because "everybody's liars." Megan testified that Nathaniel "did not present with mental things at that moment in time, but it was clear that he was semi-intoxicated."

Megan testified that the first time she had an indication that Nathaniel might be dealing with mental health issues was on December 24, 2022, when Nathaniel texted Megan that she could have the boys for the entire winter break. After informing Nathaniel that she would need to see that in writing from his attorney, she received a call in her capacity as a volunteer of the fire

department and rescue squad and was placed on standby for a possible suicide attempt at Nathaniel's address.

Megan further testified to concerns related to an incident that occurred in the summer of 2023 when Nathaniel's girlfriend took Wyatt to Iowa without her knowledge. She testified to another incident where Nathaniel's girlfriend again took some of the children to Iowa and Nathaniel concurrently texted her despite the parenting plan requiring the parties to provide 48 hours' notice.

Megan also testified that since May 23, 2024, Hunter and Wyatt refused to return to Nathaniel's home following a May 3 incident when Wyatt had bruising on his arms. Although Megan testified that she encourages the boys to attend visits with Nathaniel, she does not punish them or incentivize the children for not attending visits. Megan testified, however, that she filed a protection order against Nathaniel and Payne in May after finding bruising on Wyatt's forearms and right hip. Megan testified that Owen continued to willingly attend visits with Nathaniel during the period of time that Hunter and Wyatt refused to attend visits.

Megan testified that since the entry of the initial divorce decree, the boys had at least three interviews with either the child advocacy center or with law enforcement. Megan testified that the protection orders, terroristic threats by Caitlin to shoot Nathaniel in his face, domestic violence, law enforcement contacts, and Nathaniel's threats of suicide caused her concern about what the boys were being exposed to in Nathaniel's home. Megan testified that although the children were not present during the law enforcement contacts, she believed that Nathaniel's excessive contacts with law enforcement spoke volumes about his home life and his ability to care for the children. Megan stated that she believed a modification of custody was in the children's best interests.

## Ruiz' Testimony

Andrea Ruiz testified that she is a mental health therapist and provided counseling services to Hunter for approximately 2 years. Ruiz initially saw Hunter due to behavioral issues at school, but during two different sessions, Hunter raised issues which caused her concern and required her to make a report to the child abuse and neglect hotline. The first issue occurred sometime in July 2023, when Hunter reported to her "something about riding in the vehicle with [Nathaniel] and seeing [Nathaniel] drinking an . . . alcoholic beverage." Ruiz testified that the second incident occurred in early 2024 when Hunter stated "that he had access to the gun safe because it was kept unlocked. And that if he needed to, [Hunter] would take the guns out to defend the house."

## Deputy Anderson's Testimony

Deputy Anderson testified that through his work as a law enforcement officer, he was familiar with Nathaniel. Deputy Anderson testified that he had contact with Nathaniel on May 23, 2022, after he was notified by dispatch of a report of a suicidal male who stated that after he finished his four cigarettes, he was going to shoot himself with a handgun. Deputy Anderson also testified that the Seward County Sheriff's office had received at least two or three reports of alleged child abuse or neglect by Nathaniel.

SERGEANT SCHAEFER'S TESTIMONY

Sergeant Schaefer testified that he worked multiple calls involving Nathaniel. Sergeant Schaefer testified that on October 10, 2022, he responded to Nathaniel's report that Caitlin had punched him in the face. Sergeant Schaeffer testified that during this contact with Nathaniel, he observed a bottle of whiskey on the counter and observed that Nathaniel had "bloodshot, watery eyes, [and] slurred speech." Sergeant Schaefer also stated that Nathaniel admitted to consuming alcohol.

Sergeant Schaefer had another contact with Nathaniel 2 weeks later on October 24, 2022, after Nathaniel contacted law enforcement reporting that he had violated the protection order that Caitlin had against him. During that service call, Sergeant Schaeffer "talk[ed] to [Nathaniel] about the situation. And [Nathaniel] was in his garage, had a beer in hand, [and] a bottle of whiskey on the counter. Again, [Nathaniel had] slurred speech. And he stated he had been drinking." Several months later, on Christmas Eve, Sergeant Schaefer responded to a report from another party that Nathaniel "was suicidal and that she was on the phone with him and heard a loud bang and could no longer make contact with him." After contacting Nathaniel, Sergeant Schaefer observed that Nathaniel "appeared to be intoxicated" and "was consuming alcohol in the garage."

SERGEANT BECKER'S TESTIMONY

Sergeant Becker testified that he had several contacts with Nathaniel. According to Sergeant Becker, on July 29, 2022, he responded to Nathaniel's report that Nathaniel's ex-girlfriend threatened his life. Then, on November 6, Sergeant Becker responded to a request for a welfare check after Nathaniel's girlfriend reported that Nathaniel had texted her threatening to take both his and his dog's lives. Sergeant Becker testified that upon contacting Nathaniel, he observed that Nathaniel was under the influence of alcohol.

The following month, Sergeant Becker had another contact with Nathaniel after Nathaniel called law enforcement stating that he was having suicidal thoughts and planned to hang himself. Sergeant Becker testified that Nathaniel "was more intoxicated than the last time I had contact with him." Sergeant Becker testified that additional dispatch calls related to Nathaniel and Caitlin have been "an ongoing problem" and that "more times than not, [Nathaniel] is intoxicated." Sergeant Becker testified that the most recent contact he had with Nathaniel was "maybe a month ago."

According to Sergeant Becker, following each of his contacts with Nathaniel, there were no concerns that Nathaniel presented an imminent threat to himself or others. Sergeant Becker testified that he believed "[a]t the time, for everything that [Nathaniel] was going through with his ex-girlfriend, I think it was more of a wanting to make her feel bad than a mental health issue."

MCMAHON'S TESTIMONY

McMahon testified that she was familiar with Megan and Nathaniel because their children played sports together and that both Nathaniel and Megan attended the children's games. McMahon testified to an incident that occurred in May 2024 when Megan arrived late to Wyatt's game after coming from Hunter's game and was visibly upset and "she was crying because she said the police had arrived at the [earlier] game . . . and there was a big scene with the boys." McMahon testified that "[Megan] was just hoping that the police officers could arrive for when

the game was over and Wyatt was going . . . to decide if he was leaving with [Nathaniel]." McMahon testified that after the game ended, she overheard Nathaniel yelling at Wyatt saying, "tough shit" and later observed Nathaniel leave in a "very aggressive" manner, which she described as Nathaniel "revv[ing] his engine on the rocks, then got out onto the road and peeled off out of there." McMahon testified that Nathaniel's girlfriend was also present and videotaped the incident. McMahon testified that Wyatt did not end up leaving with Nathaniel. McMahon testified that she did not observe any other issues or concerns except for the May 30 incident.

### CONNERS' TESTIMONY

Conners testified that she was Nathaniel's sister and lived across the street from him. According to Conners, the relationship between Nathaniel and his children was "really good," the children loved coming to Nathaniel's house and seeing Nathaniel, and Nathaniel had rules and expected the children to be respectful. Conners testified that she believed Nathaniel was a responsible parent and she did not have concerns about Nathaniel's behavior or mental health. Although Conners admitted that she was aware of Nathaniel's May 2022 contact with law enforcement when he threatened to kill himself with a handgun, she was unaware of the other law enforcement contacts.

### PAYNE'S TESTIMONY

Payne testified that she was Nathaniel's girlfriend and that she started dating Nathaniel in February 2023. Payne testified that they moved in together in July, that she does not have any concerns regarding Nathaniel's mental health or suicidal ideations, and that Nathaniel had a great relationship with his children.

### MODIFICATION ORDER

In July 2024, the district court entered its order of modification which awarded Megan sole legal and physical custody of the parties' children subject to Nathaniel's reasonable rights of parenting time. The court specifically found that:

> The evidence adduced at trial establishes that various issues have arisen since entry of the Decree of Dissolution of Marriage on December 27, 2021, which negatively impact the parties' minor children. Those issues include, but are not limited to, the following:
>
> a. [Nathaniel] was in a relationship with a female following the dissolution of the parties' marriage and continuing through 2022 during which he had multiple law enforcement contacts and became subject to two (2) separate protection orders filed by said female in this court, specifically a harassment protection order . . . obtained [on] October 11, 2022 and a second harassment protection order . . . obtained on March 29, 2023. [Nathaniel] unsuccessfully attempted to obtain a harassment protection order against this individual on April 13, 2023 . . . Said law enforcement contacts, protection order actions, death threat(s), and the existence of domestic violence, are not in the minor children's best interest, regardless of the children's level of exposure thereto.
>
> b. At least four (4) law enforcement contacts with [Nathaniel] were due to those mental health issues referenced by [Megan] in her Complaint for Modification. Specifically, law enforcement responded to dispatches to [Nathaniel's] home due to

[Nathaniel's] suicidal ideations, or similar threats of self-harm, on May 23, 2022, November 6, 2022, December 9, 2022, and December 24, 2022.

c. [Nathaniel] presented no evidence that he made any substantive efforts toward addressing whatever mental health issues led to his express suicidal ideations and resulting law enforcement contacts. [Nathaniel] obtained a mental health evaluation. The evaluation contained no collateral information and is of limited value. [Nathaniel] met with . . . Lepard, a counselor in the Lincoln area, on a handful of occasions. [Nathaniel] obtained an alcohol evaluation. The alcohol evaluation did not contain collateral information and is of limited value. [Nathaniel] minimized his alcohol use in the information provided to the evaluator. [Nathaniel] obtained a prescription for Naltrexone, an alcohol inhibitor. He took that prescription for 90 days, but testified that he nevertheless continued to drink. [Nathaniel] testified that he continues to drink up through the date of the trial.

Nathaniel now appeals from the district court's order awarding Megan sole legal and physical custody of the parties' minor children.

## ASSIGNMENTS OF ERROR

Nathaniel assigns that the district court abused its discretion in (1) modifying the existing parenting plan to award Megan sole legal and physical custody of the parties' children; and (2) in calculating child support.

## STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record and will be affirmed absent an abuse of discretion. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021).

## ANALYSIS

### MODIFICATION OF CUSTODY

Nathaniel first contends that the district court abused its discretion modifying custody to award Megan sole legal and physical custody of the parties' children. In support of his claim, Nathaniel asserts that the district court was limited in its modification remedy because Megan did not request a change of custody but rather she requested a modification of the parenting plan to include safety provisions that "formed the issues upon which her modification complaint was to be tried"; that the evidence demonstrated that any material change in circumstances was only transitory; and that Megan failed to demonstrate that any material change in circumstances affected the best interests of the children, all of which prohibited a finding that custody should be changed. Brief for appellant at 17. We will address Nathaniel's arguments independently.

As it relates to Megan's complaint for modification, her specific request for relief was that the parenting plan be modified "to include certain safety plans and provisions to include, but not necessarily be limited to, requirements of counseling and therapy, as well as any other items and conditions deemed appropriate by the Court." In that regard, Megan argues that Nebraska is a notice pleading state and the pleading need only give fair notice of the claims asserted. To that

end, Megan generally averred that there had been a material of circumstances since the court entered its original decree granting joint custody; that these circumstances required a modification of the decree; and that the modification should be guided by terms and conditions deemed appropriate by the court. We agree. Although Megan requested that modification of the decree should include, but should not necessarily be limited to, requirements for counseling and therapy for Nathaniel, she more generally averred that modification was necessary and should be guided by terms and conditions deemed appropriate by the court due to changed circumstances we discuss more thoroughly below.

Neb. Rev. Stat. § 42-364(6) (Cum. Supp. 2024) authorizes modification proceedings related to support, custody, parenting time, visitation, other access, or removal of children from the jurisdiction of the court. "A proceeding to modify a parenting plan is 'commenced by filing a complaint to modify.'" *Christine W. v. Trevor W.*, 303 Neb. 245, 248, 928 N.W.2d 398, 402 (2019); See also § 42-364(6).

Here, Megan clearly filed a complaint to modify requesting modification of the prior decree in a manner deemed appropriate by the court. This pleading fairly apprised Nathaniel of the general request for modification as it related to the circumstances Megan described and we reject Nathaniel's assertion that the court was limited in the scope of its modification order by the nature of how it was pled.

Nathaniel next argues that although there may have been some changes in circumstances since the prior decree, those circumstances were transitory in nature and prohibited a finding that a material change had taken place as of the date of trial. We disagree.

As the Nebraska Supreme court set forth in *Lindblad v. Lindblad*, 309 Neb. 776, 788-89, 962 N.W.2d 545, 554-55 (2021):

> Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. Modifying a custody or parenting time order requires two steps of proof. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. . . .

> Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. We have explained that proof of a material change in circumstances is the "threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances." The rationale for limiting modifications of custody and parenting time to only those necessitated by a material change in circumstances is to avoid extensive and repetitive litigation and unnecessary, potentially harmful fluctuations in the child's life. Simply put, a custody or parenting time order will not be modified absent proof of new facts and circumstances arising since the order was entered that affect the best interests of the child.

The material changes in circumstances Megan described at trial included an abusive relationship Nathaniel had entered into since the prior decree that led to two protection orders, multiple visits from law enforcement to Nathaniel's home in response to suicidal threats communicated by Nathaniel, and episodes of excessive use of alcohol that were seriously impacting Nathaniel's life and conduct.

Although Nathaniel does not dispute that for a 7-month period he experienced some mental health issues, had a toxic relationship with an ex-girlfriend, and exhibited a period of excessive drinking, he argues he had resolved those issues by the time of trial and the conditions were transitory. But the record reads differently. Just prior to Megan's filing of her request for modification in January 2023, Nathaniel engaged in a multitude of acts that were consistent with Megan's allegations. Those included a July 2022 report to law enforcement that his then-girlfriend threatened to kill him; an October 2022 report by Nathaniel to law enforcement that his then-girlfriend struck him in the face, followed by an interview of Nathaniel where he appeared intoxicated; an October 2022 sheriff's report indicating that Nathaniel violated a protection order obtained by his girlfriend, which was followed by an interview of Nathaniel where he again appeared to be intoxicated and had blood on his person; May and December 2022 contacts to law enforcement when Nathaniel threatened to kill himself, which resulted in the removal of his firearms and descriptions by law enforcement that Nathaniel was severely intoxicated; a November 2022 text from Nathaniel to his then-girlfriend that he was going to kill himself, followed by an investigation where Nathaniel was found intoxicated; and another similar call to dispatch in December 2022 when Nathaniel again threatened suicide and was found intoxicated and continuing to consume alcohol.

Notwithstanding Nathaniel's erratic behavior, he argues that his behavior was limited to a 7-month timeframe and that he had personally resolved his issues by the time of trial. As it relates to that argument, the district court found that Nathaniel

> presented no evidence that he made any substantive efforts toward addressing whatever mental health issues led to his express suicidal ideations and resulting law enforcement contacts. [Nathaniel] obtained a mental health evaluation. The evaluation contained no collateral information and is of limited value. [Nathaniel] met with . . . Lepard, a counselor in the Lincoln area, on a handful of occasions. [Nathaniel] obtained an alcohol evaluation. The alcohol evaluation did not contain collateral information and is of limited value. [Nathaniel] minimized his alcohol use in the information provided to the evaluator. [Nathaniel] obtained a prescription for Naltrexone, an alcohol inhibitor. He took that prescription for 90 days, but testified that he nevertheless continued to drink. [Nathaniel] testified that he continues to drink up through the date of the trial.

We agree.

Although the record does not include more recent incidents rising to the same level of severity as the described incidents taking place from approximately May through December 2022, which resulted in protection orders and multiple calls to law enforcement, we note that Sergeant Becker testified that his most recent contact with Nathaniel was approximately a month prior to the trial. Further, there is little to no evidence that speaks to the root cause of Nathaniel's mental health problems or effective mitigation plans or efforts that were designed or implemented to

resolve them. And as we describe more fully in the next section of this opinion, the evidence demonstrates Nathaniel's behavior has and continues to impact his children in a detrimental way. As such, we reject his contention that his behavior was only transitory and resolved, and that the district court abused its discretion in finding it was not.

Nathaniel finally argues that there was no evidence showing that his conduct negatively impacted his children. Again, we disagree. The record shows that since the entry of the initial decree, Nathaniel had numerous contacts with law enforcement due to his romantic relationships and his mental health. Although Nathaniel argues that there was no evidence showing that these issues impacted the children, at least as of May 2024, Hunter and Wyatt began refusing to attend visits with Nathaniel after "finding bruising on Wyatt's arms [on] May 3rd." Megan testified that when she attempted to drop off Wyatt and Hunter for visits with Nathaniel, Wyatt and Hunter would start to cry, walk away, resist speaking to Nathaniel, and refuse to exit her vehicle. Megan testified that this has led to Nathaniel yelling at the boys. And Megan testified that on July 4, an incident occurred when the boys were refusing to go on a visit and Nathaniel started screaming, "Get in. It's not your choice. It's court order." McMahon similarly testified to overhearing Nathaniel yelling at Wyatt on May 30, when Wyatt refused to leave the game with him.

Megan testified that since the entry of the decree, the children had to be interviewed on at least three occasions by either the Child Advocacy Center or law enforcement. The evidence showed that the children were interviewed as recently as May 2024, following a report to the child abuse and neglect hotline that Payne, Nathaniel's girlfriend at the time, was physically neglecting the children.

Megan testified that she filed for a protection order at that time that was received into evidence with attached photos of the bruising. The record showed that both Wyatt and Hunter are involved in counseling. Hunter's counselor, Ruiz, testified that on at least two occasions she had to contact the child abuse and neglect hotline as a result of statements made by Hunter about Nathaniel during counseling sessions. Specifically, Ruiz testified that in July 2023, she contacted the hotline after Hunter made a statement about Nathaniel drinking alcohol and driving while he was in the car. Additionally, in early 2024, Ruiz made a second call to the hotline after Hunter made statements about firearms being easily accessible to him and his brothers in Nathaniel's home and Hunter's willingness to defend the home against an intruder if necessary.

In November 2023, Nathaniel completed a substance use evaluation wherein he indicated that from January 2021 to May 2022, and from November 2022 to January 2023, he drank three or four mixed drinks daily, and that "his drinking while he was with his ex-girlfriend affected his relationship with his children." The evaluation provided that Nathaniel met the criteria for mild substance use disorder but made no recommendations for treatment.

Based upon the aforementioned evidence, we find that the district court did not abuse its discretion in finding that a material change of circumstances affecting the children's best interests existed. We then turn to whether modification was in the children's best interests.

Consideration of the child's best interests involves a combination of both mandatory and permissive factors. *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) requires that certain factors must be considered, including (1) the relationship of the child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health,

welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *Id*. Other relevant considerations that may also be considered include the stability of the child's existing routine, minimization of contact and conflict between the parents, and the general nature and health of the child. *Id*. No one factor is dispositive, and various factors may weigh more or less heavily, depending on the case. *Id*. In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Westerhold v. Dutton*, 28 Neb. App. 17, 938 N.W.2d 876 (2020).

Here, based on the evidence presented, it appears that Nathaniel's relationship with his children had become strained as evidenced by their refusal to attend visitation. Although the numerous law enforcement contacts did not occur in front of the children, Nathaniel acknowledged that he asked Megan to take the children on one occasion because he needed to "get out of here." The environment offered by Nathaniel was not conducive to the well-being of his children. Testimony by the therapist indicated that Nathaniel consumed alcohol in the children's presence and on at least one occasion, he drove with the children in the vehicle while consuming an alcoholic beverage. Nathaniel has been involved in relationships involving domestic violence. And Hunter indicated to his therapist his willingness to access guns in an unlocked gun safe to defend the home from an intruder if he needed to. Nathaniel admitted at trial that he continues to drink alcohol, albeit a reduced amount. And, despite receiving counseling treatment, the record shows that Nathaniel continued to have suicidal ideations after the time at which he stated he successfully completed his counseling sessions. The record reveals that Nathaniel does not appreciate the full extent of his substance abuse and mental health concerns. Based upon all of these factors, we cannot find that the district court abused its discretion in finding that modification of custody was in the minor children's best interests.

CHILD SUPPORT

Nathaniel next contends that the district court abused its discretion in calculating his child support obligation. More specifically, he argues that Megan's income is "grossly understated." Brief for appellant at 15. He argues that when correct income numbers are utilized, his child support should be $1,341 per month on Worksheet 1 and $75 for all three children if joint physical custody was maintained. Nathaniel argues that the district court disregarded Exhibits 31 and 32, Megan's tax returns, which indicated that she regularly worked overtime hours and that those hours should have been included in calculating her total monthly income.

Child support orders are always subject to review and modification. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). A party seeking to modify a child support order must show a material change in circumstances which (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Id*.

- 11 -

But, the paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child. *Id.*

Neb. Ct. R. § 4-204(A) provides, in pertinent part, that "[t]otal monthly income is the income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages."

Here, consistent with the testimony provided by the parties regarding their respective incomes, the district court found that Megan's hourly rate of pay was $33.59 and her average monthly gross income $5,822.27. The court further found that Nathaniel's hourly rate of pay was approximately $44, and his average monthly gross income was $7,626.67. Nathaniel was ordered to pay $1,401.00 in monthly child support.

Pursuant to the Nebraska Child Support Guidelines, Neb. Ct. R. § 4-204(B),

[t]he court may consider overtime wages in determining child support if the overtime is a regular part of the employment and the employee can actually expect to regularly earn a certain amount of income from working overtime. In determining whether working overtime is a regular part of employment, the court may consider such factors as the work history of the employee for the employer, the degree of control the employee has over work conditions, and the nature of the employer's business or industry.

In *Noonan v. Noonan*, 261 Neb. 552, 560-61, 624 N.W.2d 314, 322-23 (2001), the Nebraska Supreme Court stated:

In our review of sources of income appropriate for consideration in calculating child support, we have previously determined that regularly earned overtime wages should be included. *Stuczynski v. Stuczynski*, 238 Neb. 368, 471 N.W.2d 122 (1991). In *Stuczynski*, we stated that it is appropriate to consider overtime wages in child support calculations "if the overtime is a regular part of the employment and the employee can actually expect to earn regularly a certain amount of income for working overtime." 238 Neb. at 374, 471 N.W.2d at 126. We also noted that the level of income should not be based on income that is "speculative in nature and over which the employee has little or no control." *Id.*

It is logical to extend the principles stated in *Stuczynski* to encompass forms of income other than overtime wages. Consequently, if the evidence shows that a party actually earns or can reasonably expect to earn a certain amount of income on a regular basis, it is appropriate to consider such income in calculating child support. Paragraph D of the Guidelines, which requires all sources of income to be included in calculating child support, requires such a rule. Therefore, if the moving party shows that the nonmoving party earns or can reasonably expect to earn a certain amount of income on a regular basis, a rebuttable presumption of including such income arises under the Guidelines.

After the moving party has met its burden of proof, the nonmoving party must produce sufficient evidence to rebut the presumption that the application of the Guidelines will result in a fair and equitable child support order before deviation from the Guidelines is appropriate. § 42-364.16; *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000); *Dueling v. Dueling, supra*. Thus, if the nonmoving party can show that the included income is speculative in nature and over which the person has little or no control, *Stuczynski*

*v. Stuczynski, supra*, the presumption of including the income is rebutted and it shall be excluded from the calculation.

In this case, Megan testified that she earned $33.59 per hour and copies of Megan's paystubs from May and June 2024 indicated that in each 2-week period, Megan worked 113.55, 110.95, 106.55, and 95.85 hours. Megan's 2022 tax return showed her total W2 income was $85,273 and her 2023 income was $94,087. Neither party offered testimony regarding whether Megan regularly earned overtime wages or the number of hours she generally worked per month. The type of hours she received each paycheck in May and June varied between "REG," "DIFF," "WKND DIFF," "INCENTIVE," "PTO," "CALL PAY WE," and "CLPA PTO ACCRL." Each paystub had different hours under certain categories and those categories varied by paycheck. Neither party provided testimony as to what those categories were or whether those wages were regularly earned as part of Megan's employment. Therefore, we find that the district court did not abuse its discretion in calculating Megan's total monthly income for purposes of child support.

CONCLUSION

Having considered and rejected Nathaniel's assigned errors, we affirm the district court's order modifying the parties' dissolution decree.

AFFIRMED.